# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Abdul A Jaludi

CIVIL CASE NO: 15 CV-2076
(to be supplied by Clerk
of the District Court)

(Enter above the full name of
plaintiff in this action)

v.

Citigroup
et al.

**FILED
SCRANTON**

OCT 2 7 2015

Per_____
DEPUTY CLERK

(Enter above the full name of
the defendant(s) in this action)

## COMPLAINT

1. The plaintiff ___Abdul A Jaludi___ a citizen of
the County of _____Pike_____ State of
Pennsylvania, residing at ___106 Maple ct, Milford PA 18337___

wishes to file a complaint under _18 U.S.C. § 1514A & 1513(e) (SOX)  Sarbanes Oxley_
(give Title No. etc.)
Sarbanes-Oxley Act of 2002 (SOX) & Racketeer Influenced and Corrupt Organizations (RICO) Act
codified in 18 U.S.C. §§ 1961–1968

2. The defendant is ___Citigroup and company or one or more of its direct or indirect subsidiaries___

3. STATEMENT OF CLAIM: (State below the facts of your case.  If you have paper
exhibits that give further information of your case, attach them to this completed form. Use as
much space as you need. Attach extra sheet(s) if necessary) _____

3. (CONTINUED) _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

4. WHEREFORE, plaintiff prays that _____

_____

_____

_____

_____

_____

_____

_____

(Signature of Plaintiff)                    10/27/15

106 Maple cT
Milford PA 18337

845-699-7873

## Parties

Plaintiff Abdul A Jaludi is a resident of township of Milford in the State of Pennsylvania. Plaintiff was employed by Citigroup for 26 year prior to termination by Citigroup on April 21, 2013 for whistleblowing activities protected and by defined by 18 U.S.C. § 1514A - Civil action to protect against retaliation in fraud cases and 18 U.S.C. §§ 1961–1968 - the Racketeer Influenced and Corrupt Organizations (RICO) Act, as Section 1107 of H.R. 3763 - Sarbanes-Oxley Act of 2002, codified as 18 U.S.C. 1513(e), amended the obstruction of justice statute to prohibit retaliation against employee whistleblowers not related to the purchase or sale of securities, which includes 18 U.S. Code § 1964(c) - Civil remedies.

Defendant Citigroup and company or one or more of its direct or indirect subsidiaries is an American multinational banking and financial services holding company headquartered in New York, New York.

## Statement of claim:

This action seeks declaratory, injunctive and equitable relief, back pay, reinstatement (or in lieu thereof, front pay), compensatory damages, treble damages, attorney's fees, prejudgement interest, and costs for violations based on the securities related whistleblowing activities protected under retaliation provisions defined by 18 U.S.C. § 1514A (SOX) Sarbanes Oxley, and non-securities related whistleblowing activities defined by the Sarbanes-Oxley Act of 2002 (SOX) and the Racketeer Influenced and Corrupt Organizations (RICO) Act codified in 18 U.S.C. §§ 1961–1968.

1. In violation of 18 U.S.C. § 1514A and the RICO Act without repercussion, Citigroup, through its managers, executives and attorneys, engaged in discrimination, humiliation, harassment and constructive discharge of Plaintiff because of and in retaliation for his lawful and protected acts of providing information and attempts to cause complaints to be filed with government agencies, which Plaintiff reasonably believed constituted violations of SEC and FINRA rules and/or regulations and/or provisions of Federal laws.

2. By providing information to Defendant's ethics line, managers, in-house counsel and then the SEC etc..., Jaludi engaged in protected conduct. Defendant responded by embarking on a campaign to discredit, disgrace, harass and intimidate Plaintiff under unendurable working conditions without repercussion. Jaludi's managers responsible for the discriminatory actions and/or harassing conduct were aware of Plaintiff's protected conduct. Jaludi's protected conduct constituted contributing factors in Defendant's discrimination, discrediting, termination, humiliation, and harassment of Plaintiff in violation of SOX and RICO retaliation provisions.

3. Citigroup team members to whom Jaludi provided information and who had supervisory authority over Plaintiff and/or had authority to investigate, discover, or terminate misconduct and didn't, violated SOX and RICO retaliation provisions without repercussion.

4.  Defendants Citigroup, its affiliates and key Citigroup executives, have conspired, and continue to conspire, to unlawfully withhold evidence from federal agents and obstruct justice using language in severance agreements preventing former employees from coming forward regarding illegal activities and preventing them from collecting whistleblower rewards from reporting such activity.

5.  Defendants Citigroup, its affiliates and key Citigroup executives were continually found violating various federal statutes and levied fines. After each incident Defendants showed no remorse, choosing instead to blame low level workers.

6.  Defendants Citigroup, its affiliates and key Citigroup executives, rather than improving controls, discouraged workers from reporting illegal activities by retaliating against those who came forward.

7.  Defendants Citigroup, its affiliates and key Citigroup executives maintained an organizational structure that attempted to limit criminal and civil liability to senior managements by

    a.  Allowing each individual department to perform its own ethics investigations.

    b.  Giving department managers oversight and control over HR managers thereby providing department managers the ability to compartmentalize all HR activities.

    c.  Blurring lines of responsibility by appointing co-managers.

    d.  Providing no mechanism for reporting ethics concerns directly to the board of directors.

8.  Mr. Jaludi began working for Citigroup in 1985 and aside from a two year absence, worked there for 24 years as a highly rated employee, rising from an entry level tape operator to senior vice president managing a global team.

    a.  During his first 24 years with Citigroup, Jaludi was the Michael Jordan of data center operations.

    b.  When Citigroup had trouble merging the Smith Barney and Citicorp command centers they came to Jaludi to get it done. His team did such an outstanding job merging the two command centers that users never knew it happened.

    c.  When customer complaints kept going up data center management came to Jaludi to take over the monitoring team. In less than three years Jaludi reorganized the entire monitoring process to virtually eliminate all preventable outages.

    d.  When application developers couldn't get weekly customer statements completed in

time for scheduled delivery dates data center management came to Jaludi to streamline the application.

e. When one of the business divisions failed a security audit and the information security team said they have no solution, data center management came to Jaludi to fix the issue.  The application Jaludi designed and had built, called WAIS, resolved all audit issues and was chosen as the global emergency access request application by Citigroup's security standards committee.  WAIS saves Citigroup tens of millions of dollars a year while strengthening compliant and regulatory controls.

9. In 2007 Jaludi was asked to take on the leadership role for the North America event management team within CTI for the purpose of affecting a turnaround of the troubled team.  In 2008, having affected a successful turnaround, Jaludi was also given responsibility for the North America Infrastructure and Operations Support team. In 2009, having successfully turned around both troubled teams; Jaludi was promoted to senior vice president.

10. In early 2010, in Jaludi's role as the head of Enterprise Systems Management for North America, it was his responsibility to ensure trouble tickets were created for every system and application related problem which may affect customers. As a member of the global problem management committee one of his functions was to ensure problems were properly resolved, prevented from recurring and properly tracked in the problem management system (EMS). It was in these capacities that he found problem management (EMS) tickets were being deleted, reclassified to a lower severity even though they fit the severity one criteria or not were being created at all even when system problems affected large numbers of clients and warranted a problem management ticket.

11. Severity one problem (EMS) tickets are for problems affecting large dollar amounts, such as hundreds of millions in deposits that don't get posted to customer accounts within regulatory requirements, or tens of thousands of debits that are doubled, or problems that affect large numbers of customers, such as a system problem that prevents a high number of banking customers from withdrawing funds, or prevents them from accessing their accounts. Severity one problems also include issues which may affect the integrity of Citigroup and company or one or more of its direct or indirect subsidiaries, incur large financial and or regulatory penalties

12. As a result of the financial crisis and the continual stress tests to ensure the safety and soundness of Citigroup and company or one or more of its direct or indirect subsidiaries, all severity one EMS tickets had been required to be sent to the Office of the Comptroller of the Currency (OCC), the federal agency that regulates large financial organizations. Hundreds of severity one problems that should have been reported to the OCC were not being sent, thereby providing a false sense of a safe and sound operating environment. Problem management tickets were either being deleted or lowered to a lesser severity so they wouldn't have to be reported. In addition, O&T help desks, which usually get the first notification of system

problems, began a practice of refusing to open a severity one EMS ticket unless they absolutely had to, such as a caller escalating an issue.

13. Jaludi reported these issues to his management and was told everyone knew what's being done and that it was being done to make O&T and Citigroup, which was under extreme scrutiny due to the near takeover of the financial institute by the federal government, appear more secure than it really was.

14. Citigroup Management presented federal regulators with a false image of a reliable and safe operating environment by giving the impression of a reasonable trouble free banking system. This was done by manipulating the problem management system to show a decline in system related problems and preventing issues from being reported. Jaludi kept reporting this issue to senior management, following the chain of command, through emails, using the ethics complaint system, to the CIO, Mr. Jagdish Rao, town hall through the website and in person.

15. Jaludi also sent an email to the CEO, Mr. Vikram Pandit in early 2010, regarding management practices within O&T. About a later Jaludi was called to see the O&T North America data center head, Mr. Tony DiSanto, who was unhappy Jaludi had written to the CEO. DiSanto, who stated he did not have the email but that Mr. Don Callahan, Citi's CAO, had called him and read him the email over the phone then asked DiSanto to take care of it.

16. In 2009, Jaludi was asked to create a disaster recovery site for the Weehawken command center in Long Island, NY to address the centers inability to recover from a disaster, despite claiming otherwise during federal and internal audits. Senior management became aware the two North America command centers had no working disaster recovery plan, that the two North America command center in The Lakes, TX and Weehawken, NJ did not have the resources or training to recover if the other site failed, as had been documented and told to regulators. Jaludi was blamed for leaking this information. This problem became even more acute when the two command centers were merged into one large command center in Texas, with no national backup. This information was provided to the OCC, the SEC, and members of the senate banking committee.

17. During this timeframe Jaludi's management kept telling him he should keep his mouth shut. His former manager, Mr. Silvio Ottolia, had also told him Tony DiSanto hated his guts for refusing to keep his mouth shut and wanted him fired.

18. In the 2rd quarter of 2010 Ottolia informed Jaludi he was being moved down one level, and would be reporting to Mr. Steve D'Amato. Jaludi was told to go visit his new boss in Delaware. After this conversation Jaludi went to see his current manager, Ms. Christine Cullison and asked her if it was true, that he had been moved down one level. Cullison told Jaludi it was out of her hands. She stated this was being ordered by Mr. Alberto Montufar (now South America CTI head reporting to Jagdish Rao) under the premise of consolidating the mainframe automation and distributed event management teams. Both D'amato and Jaludi reported to Cullison, who told

Jaludi he was much more qualified and the best individual to manage the combined team, but that her hands were tied.

19. Cullison told Jaludi to put together a presentation of his accomplishments for her to present to her new boss (Mr. Larry Proctor). Within a few days, while Jaludi was on vacation and working on the presentation, new org charts were made and sent out showing Jaludi reporting to one of D'amato's directs, lowering him down two levels.

20. Jaludi voiced his concerns about what was happening behind closed doors to Ottolia, Cullison and Proctor. Proctor said that a fair selection process would take place, even though new org charts had already been distributed. Nothing happened until a month later, in early 3rd quarter 2010, when Jaludi's teams, which included North America event management and the command center automation teams, were taken away from him.

21. For two months Jaludi had no staff reporting to him nor was he given any work to do. Then, in late 4Q 2010, Jaludi, who had worked in the Citigroup Technology Infrastructure division (CTI) for 22 years, was transferred to the Infrastructure tools and Data Center automation group (ITDCA) of the Citi Architecture Technology Engineering division (CATE) and reporting to Mr. Motti Finkelstein. During their initial meeting, Finkelstein said he was told to take Jaludi and did not know what to do with him. About two months later a new manager (Mr. Madhu Aiyappen) was transferred from CTI to manage the group, adding a layer of management between Finkelstein and Jaludi. In May 2011, without cause, Aiyappen demoted Jaludi to an entry level Unix administrator position, even though Jaludi had no Unix experience. On May 31, 2011 Jaludi sent Aiyappen an email asking for a reason for the demotion. This is the response he received via email:

> *It's not a demotion by any means. I will call you and explain (**he never did**). The projects you will be working will be managed by TK. The organization is still going through restructuring and realignment.*

The ITDCA team was responsible for data center tools, which included Tivoli and scheduling applications, both of which Jaludi was a subject matter expert, but Jaludi was never asked to work with either team, unless they ran into problems. Instead Jaludi was told to learn Unix and software packaging, normally functions for junior workers.

22. In 2009 Jaludi had founded the WAIS application, a tool that automated mainframe tasks, including requests for emergency access to production which resolved audit violations since the manual process violated numerous security standards. WAIS was chosen by the security standards committee as the global standard, replacing the manual process and a vendor application, saving over $1 million per year. From initial rollout until early 2011 Jaludi had been continually asked to help various divisions within Citi to migrate onto the WAIS application. This stopped in 2011 when Jaludi was ordered by Aiyappen to cease all WAIS activities, saying there was no expertise within ITDCA, even though Jaludi was the technical expert and WAIS was an infrastructure automation tool. In addition, while all engineering work was being moved to

ITDCA, Aiyappen refused to take ownership for WAIS, even though Jaludi was the founder, technical expert, technical support manager and the operational and engineering owner of the product. Instead he was ordered to train a security administration team to take over support for the product and perform the functions of a low level Unix administrator, although he had no Unix experience.

Initially, Jaludi was told he could work on WAIS only if a request for help came in. One request came in June from the compliance officer (Mr. Luis Soto) for Citi's Institutional Clients Group (ICG) to help move the remaining businesses within ICG to WAIS. Jaludi had worked with Soto in the past and had brought over half of the ICG businesses to WAIS. In early June Soto asked if he could help move the rest of ICG to WAIS. Jaludi asked Aiyappen, who said he could help only if the request came through the workflow system, even though email requests were commonplace.

On June 9 2011 Jaludi forwarded an email from Soto giving the workflow # and asking if it was assigned to the right group. The workflow requested Jaludi's help in a project expected to result in a $1 million save. This was Aiyappen's response:

> *What is the math behind this huge $1,000,000,00 save.*

Ten minutes later, Aiyappen rejected the request for help with this response:

> *As stated previously, your goal should be to work on PSE initiatives and disconnect from operations and project management activities for SD.*

23. Another request came in July, 20, 2011 from Mr. Hugh Leung, senior manager for the Mainframe systems team who said the security team which took over WAIS was having problems putting the Mainframe emergency ID process onto WAIS and needed Jaludi's help.

> *Can you forward my request to Motti and Madhu that I would like you to complete the DMZ and GDPS lpars.*

This request was denied by Madhu, even though they were assigning Jaludi very little work to do.

24. On June 24, 2011 Jaludi received an email from Ottolia, who was now in charge of the command center relocation project, asking who his manager was and who he worked for. Jaludi replied TK, Madhu then Motti. In response Jaludi received the following email from Ottolia:

> *I will be sending them a request to use your services to get estimates for building a new CC in Texas as well as a satellite in Rutherford.*

This was followed by another email 21 minutes later:

> *I am asking TK and his manager for your assistance to develop and build out costs for a large scale CC in Texas and a new one in Rutherford. Will also need to consider reconfiguring/enhancing the Singapore and Warsaw location for the Global CC strategy.*

This was followed 7 minutes later with this email:

> *I have already spoken to Madhu and he is OK with it. Also will try to get you into our org and part of the strategy.*

25. Jaludi was the 'go to' person for all command center projects. He had developed the NA command center monitoring, incident and problem management strategies, managed the staff when the director was out, and performed all command center builds, consolidations, upgrades and moves.

26. A few weeks later Jaludi called Silvio to get a status on the transfer and was told that Tony DiSanto will never allow it. Ottolia was also told to not seek help from Jaludi for anything or attempt to transfer him into his team. Despite this warning Ottolia scheduled a conference call during the weekend where Jaludi helped him put together a strategy for the command center relocation, working two days on his own time to formulate the plan which Ottolia and Phil Gasparino, head of production scheduling said looked good.

27. Every few month's a new request for help came to the team and Madhu would send an email to the entire team asking for volunteers. For each of these emails Jaludi had responded that he would be happy to take any of the requests but was always ignored.

28. In 3Q 2011, Citi create a contest to find the best future of banking ideas. Jaludi submitted an idea (Family Banking) which made it into the top ten. Jaludi asked management within CTI and CATE for support, to encourage their staff to review the ideas, but not a single email or mention of support was provided.

Without any support from CATE, and limited support from CTI, Jaludi's idea was selected as the winning idea in March 2012, beating 2,500 other ideas with 65,000 participants. A second idea was chosen as the co-winner and a marketing company (IDEO) hired by Citi estimated at least $100 million in revenue and 4,500 new customers for the first year the combined idea is implemented. Jaludi was part of the team which presented this to Vikram Pandit, Citi's CEO, in NY. Shortly afterwards, Jaludi was given an unsatisfactory performance rating, stating he failed to meet the company's expectations.

29. Several months later Jaludi was asked to give a presentation to Tony DiSanto's team by his new chief of staff, Tony Concolino, who was unaware of complaints Jaludi had been making regarding O&T. Tony DiSanto was on vacation at the time and unaware of the request. The presentation was to be held at Tony's next staff meeting in New York, a monthly meeting which included his directs and one level down.

30. Jaludi and one of his direct reports attended the meeting and were to present first. Tony DiSanto walked into the conference room five minutes late, with more than 50 people around the globe waiting in the room, on conference lines or video conference. Tony Concolino asked the senior manager for data center operations to introduce me but he refused saying his video conference equipment wasn't working properly even though he just had a properly working conversation with someone else in the room.

31. Jaludi introduced himself and began giving the presentation on Family banking. During the first 20 minutes Jaludi was continually heckled by Tony DiSanto. Every few minutes he would pick up his blackberry, look at the screen then toss it onto the table. He also kept making confrontational statements or asking confrontational questions, such as 'where did you get your data?', 'That's not the correct churn rate', 'Chase already does that', 'who is paying for this' and so on. This stopped when someone called DiSanto on his mobile phone and the rest of the presentation went on without any comments or questions from anyone. During the entire 30 minute presentation no one else in the room, on video or on the phone made any comments or said anything aside from the heckling by Tony DiSanto. Several weeks after this meeting Tony Concolino was dismissed.

32. One of the Citigroup Challenge judges, Francesco Vanni D'Archerifi, CEO of the ICT division) noticed in Jaludi's bio that he was writing a book on Command Centers and asked for his help with his business command center (BCC), which Jaludi's staff had helped to build. He asked Jaludi to help the Command Center, which moved from New York to Delaware (BCC) implement monitoring in order to reduce the number of customer problems. Over the next few months Jaludi met with management and staff within the BCC and was told by Angelo Markakius, the BCC manager in Delaware "*we know what Francesco wants but were not going to do it*". O&T wanted the BCC to focus on other matters, such as creating reports, even though that wasn't part of their function and went against their goals and not bother opening problem management tickets. Nonetheless, I sent Francesco and the BCC recommendations for automating and streamlining the center.

33. In 3Q 2012 Jaludi was contacted again by Francesco asking for help with the BCC again. Jaludi had a one hour private face to face meeting with Francesco in his NY office where he seemed desperate for help. Clients had been calling with service complaints. For example, Francesco referred to an incident affecting Exxon, ICT's largest customer. Over $300 million in customer transactions sent by Exxon to Citigroup had not been processed until three days later, after Exxon staff called looking for the transactions. The Exxon CEO had called Francesco to complain. Francesco's directive to Jaludi, which he confirmed via email, was to help the BCC prevent customer outages, reduce outage durations and to implement better monitoring and reporting so that Citi management knew about these issues first rather than from clients.

34. Jaludi performed a full review of the BCC incident management process and found that outages and outage durations have been going up. The main problem was they were avoiding opening trouble tickets, and when they did, created them as level two rather than level one so they

wouldn't have to be reported to the regulators. For example, even though a post mortem report was created for the Exxon issue, no trouble or problem management ticket was ever created. While trying to address this Jaludi spoke to the manager for the Delaware BCC, Angelo Markakius, who said they will not change their policy of not opening tickets for every problem since it would make O&T metrics look bad, and they would classify all issues as severity two so they would not get reported to the regulators.

35. In 4Q 2012 Jaludi sent a note to Jon Beyman, CIO for O&T ICT division, regarding these practices and the lack of a problem manager for the ICT division along with suggestions on resolving the issue. Beyman said he had other ideas and would be happy to speak to Jaludi about them. Jaludi attempted to schedule a meeting with Beyman on numerous occasions but was either ignored or told Beyman was too busy.

36. Jaludi found was at least 25% of the problems affecting customers were caused by O&T developers working in Beymans organization. While reviewing problem management tickets Jaludi found many customers facing the same problem for days or even weeks, or constantly recurring, issues which would have opened the bank to regulatory fines if reported to regulators or closure, which had already happened in Japan due to the lack of appropriate oversight. One US corporate customer threatened to leave the bank if the issue wasn't resolved soon while another customer in Japan threatened to go to the regulators if the problem wasn't corrected.

37. Jaludi made recommendations to ICT and CTI for reducing customer affecting system and application problems. Work had begun on implementing some of these recommendations with a weekly meeting to review the process. In Dec 2012, Jaludi was told by Beyman that he was wasting his staff's time and to immediately stop what he was doing and not to tell anyone about that cease request.

38. On April 21, 2013 Jaludi was dismissed, even though O&T was undergoing extensive process improvement efforts and numerous departments were requesting his help in those efforts. Jaludi had written a book on process improvements (The Art of Process Improvement) and although had proven his abilities with implementing process improvements was never asked to perform this function within Aiyappen's team, nor allowed to help other departments that were requesting his help. Instead Jaludi was asked to install and test software on Unix servers, a function he did not have the technical expertise nor the training to perform.

39. Shortly after Mike Corbatt took office Jaludi sent him an email mentioning some of his accomplishments and that he was being retaliated against by management for raising ethical concerns. Jaludi did not get a response. On March 6 Jaludi called Don Callahan's office and spoke to his secretary. He told her he felt his layoff was due to retaliation and was told they would get back to him. A few days later Jaludi received a fedex from Andrew Smith, a Citigroup attorney, with a memo dated Mar 8, 2013 saying any further communication with Citigroup must go through him and the following:

*Your message to Don Callahan of March 6 has been forwarded to me for a reply... As communicated to you on Feb 20, 2013, due to deteriorating business conditions and budget constraints, CTO performed a thorough business review to realize cost efficiencies. As a result, several job functions were identified for job elimination. Unfortunately, your position was one of those functions, and has been eliminated at this time. Your inclusion in this reduction in force was for no reasons beyond that business review.*

40. Messrs. Aiyappen, Beyman, Callahan, DiSanto, Rao, and Montufar discredited, humiliated and had Jaludi terminated for disseminating information detailing how Montufar and Beyman's teams misled executive management and federal regulators violating retaliation provisions of 18 U.S.C. § 1514A (SOX) Sarbanes Oxley, and non-securities related whistleblowing activities defined by the Sarbanes-Oxley Act of 2002 (SOX) and the Racketeer Influenced and Corrupt Organizations (RICO) Act codified in 18 U.S.C. §§ 1961–1968

41. Anyone who reports ethics issues within Citigroup is usually penalized. Ethics complaints go to the HR department which is aligned to the senior manager within a department. HR members are more loyal to the managers they represent than to the corporation.

42. People in O&T are afraid of submitting any ethics complaints for fear of retaliatory actions. This was also apparent in the Voice of the Employee (VOE) surveys. The VOE survey was implemented at the request of federal regulators. Although Citigroup claims the VOE survey is anonymous, workers are afraid of voicing their complaints for fear of retaliation, since each worker is required to enter their employee ID number when taking the survey.

43. Although ethics complaints are supposed to be anonymous, managers usually know the people who've submitted ethics complaints.  An example: around late 2009, a person submitted an anonymous complaint to the North America Data Center Operation head (Alberto Montufar) town hall website regarding the new person hired to manage the Rutherford Data Center, who had no experience in with Citigroup data centers, although there were many qualified individuals who were working in Rutherford, all of whom were overlooked for the position. This question was read during the townhall, apparently by mistake. Mr. Montufar did not provide an answer but directed whoever submitted the question to file an ethics complaint. Two weeks later, Mr. Montufar's administrative assistant and others were chatting about the individual by name in the Rutherford building who submitted the ethics complaint regarding hiring practices.

44. A similar incident occurred with the Silver Spring Data Center.

In 2009, there was an open position for a data center manager to manage the Citigroup Silver Springs location. Two qualified individuals applied for the position, however, Mr Montufar gave the position to a project manager (Jose Pacheco). Mr Pacheco had never set foot in a data center nor was he familiar with data center management. Two well qualified individuals applied for the position, but were never selected. One of the people who applied was transferred to Texas and the other who kept complaining (Bob Earomirski) was given an early retirement

package. At one point Mr. Pacheco wanted to eliminate the UPS system protecting the Data Center in case of a power failure, but was prevented when staff members intervened.

45. A year after being dismissed from Citigroup former direct reports stopped calling returning calls or responding to emails and text messages from Jaludi as a direct result of warnings from their manager that it was not in his best interest to have anything to do with Jaludi.

46. In May 2014, a former coworker at Citigroup who had been constantly endorsing Jaludi on LinkedIn over the course of a year offered to get him a job at CA when requested by Jaludi. The coworker at the time had been unaware of the circumstances surrounding Jaludi's termination said his firm had several openings and saw no problem with getting Jaludi a job or at least some interviews, since he had done the same for a few others from Citigroup. Jaludi never heard back from the coworker, even after sending him emails and leaving voice mails. The coworker also stopped endorsing Jaludi on LinkedIn and broke off all communications.

47. In September 2014 Jaludi interviewed for a position at Metlife. During the interview the hiring manager stated he needed Jaludi's expertise since the incident management process at Metlife was in disarray. The interview ended with the hiring manager stating he wanted Jaludi to meet with two other individuals prior to bringing him on board. After the interview Jaludi never heard back from Metlife. Jaludi tried calling and sending emails to the hiring manager but never got a response. One of the hiring managers co-workers was a friend of Mr. Alberto Montufar.

48. In November 2014 a retired coworker called Jaludi saying he knew someone at Citigroup with several openings. Jaludi received a called from this person, unaware of the circumstances surrounding Jaludi's termination, saying he was being brought on as a consultant and will see about a position for Jaludi. In late November Jaludi received a call from the retired coworker saying the hiring manager within Citigroup with the open position was not allowed to consider Jaludi.

49. Jaludi applied for over a dozen positions with Citigroup, after his termination, for which he was qualified but never received a response. Jaludi requested help from Francesco Vanni D'Archirafi which resulted in several interviews:

    a. For a position with Onemain financial in Delaware, Jaludi underwent several interviews which culminated in word to Francesco that they changed their mind about filling the position while Jaludi was told by HR he did not have the right experience.

    b. For a position with the Local Consumer lending group, Jalud was told he was qualified but there were other candidates that had to be interviewed and a decision would be made within a week. This continued for five weeks until Jaludi asked Francesco to intervene again and was finally told they decided to promote from within.

    c. For a position with the project management office of Citi Holdings, reporting to two managers, one manager told Jaludi they had other candidates to interview and would

get back to him within a week. The next day, the second manager told Jaludi he wasn't the right fit for the position, even though he met all of the qualifications. This Director said the job posting requirements had been changed by HR and did not fit the actual requirement for the position.

d.  Jaludi applied for an entry level position at a Onemain financial branch in East Stroudsburg. An interview was then scheduled but an hour before the interview the recruiter called Jaludi saying the position had been filled. Jaludi inquired about an open position at another branch but never received a response. All of these positions were then removed from the Citigroup careers site. Several days later Jaludi called the East Stroudsburg branch and was told they had two open positions.

50. Plaintiff alleges that any reasons that Citigroup alleges that purportedly would constitute a non-discriminatory reason for his termination are actually a pre-text for prohibited retaliation defined by 18 U.S.C. § 1514A (SOX) Sarbanes Oxley, and non-securities related whistleblowing activities defined by the Sarbanes-Oxley Act of 2002 (SOX) and the Racketeer Influenced and Corrupt Organizations (RICO) Act codified in 18 U.S.C. §§ 1961–1968

51. Defendant is liable unto Plaintiff for retaliatory termination in violation of due to his continued escalation of the practice of withholding data from executive management and federal officials showing failures within the technology division which may have resulted in regulatory fines and as such, Citigroup is liable unto Plaintiff for:

a.  Treble damages which include 2 years and 8 months of lost wages, lost anticipated wages due to a wage increase, and loss of anticipated wages which would have resulted from a lost promotion;

b.  Wages in Back-pay (including benefits and wages and Front-pay wages (including benefits as reinstatement is impractical);

c.  Mental anguish and depression;

d.  Humiliation/embarrassment;

e.  Loss of enjoyment of life;

f.  Medical expenses;

g.  Attorney's fees;

h.  Costs of these proceedings; and

i.  Any injunctive relief enjoining defendants from interfering with plaintiff's efforts to obtain future employment and enjoining and permanently restraining these violations of federal law.

52. As alleged herein, Plaintiff alleges that there was no good cause to demote, terminate him and continued harassment and any reason(s) stated by the Defendant are a pretext for retaliatory animus in retaliation for protected activity 18 U.S.C. § 1514A (SOX) Sarbanes Oxley, and non-securities related whistleblowing activities defined by the Sarbanes-Oxley Act of 2002 (SOX) and the Racketeer Influenced and Corrupt Organizations (RICO) Act codified in 18 U.S.C. §§ 1961–1968, et. seq.,

53. Plaintiff reserves his right to supplement and amend this Complaint upon discovery of additional facts.

54. Plaintiff shows amicable demand to no avail.

55. A recommendation is being made to this court for the establishment of an outside entity to provide a safe haven for Citigroup employees to report unethical and illegal behavior without fear of reprisal, with the resources and authority to perform full and impartial investigations. The amount set aside for this endeavor should be equal to the profit Citigroup make during the last quarter, $4.29 billion, further ensuring the entity is not beholden to Citigroup but can operate independently.

   a. It is common knowledge the failure of Citigroup would negatively impact the health of the United States economy.

   b. It is common knowledge Citigroup was the most troubled of the major financial institutes and was almost taken over by the federal government.

   c. It is common knowledge Citigroup routinely faces internal control problems leading to enforcement actions and fines by various federal agencies.

   d. It is common knowledge Citigroup tends to reward excessive risk taking and unethical behavior that results in high profits.

   e. It is common knowledge Citigroup internal controls tend to overlook unethical behavior while penalizing those who report such activity.

   f. Citigroup executives committed fraud when they proclaimed to federal regulators the safety and health of computer systems

   g. Citigroup executives committed fraud when they proclaimed they could safely recover from any computer system or data center failure.

   h. Citigroup placed the health of the United States economy at risk by retaliating against the person reporting the risk rather than correcting the deficiency.

   i. Instead of correcting the problem, Citigroup executives made the failure scenario even more severe by merging the two command centers to reduce expenses and increase profits.

j. Citigroup came close to failing in 1990 when UPS systems failed after power to Citigroup's main data center was lost. Citigroup was able to recover only because it was able to physically move equipment and data storage units from the main data center to the backup location. Citigroup incurred huge regulatory fines for failure to recover in a timely manner. Had Citigroup not been able to recover data from the main data center, billions of dollars in transaction would have been lost, resulting in the failure of the bank.

k. Citigroup was ten times larger than it had been when Citigroup executives gave fraudulent information regarding the health of the computer systems and the adequacy of its disaster recovery plan.

l. Jaludi reported the inability for Citigroup to recover from a disaster that disabled Citigroup's only command center to the SEC, the OCC, various other government agencies and senators.

m. Citigroup's racketeering activities began with a premeditated act in 2000 with the purchase of sub-prime lender Associates First Capital, even though Citigroup already has a stellar mortgage and lending division and with Associates already the subject of controversy over predatory lending. In 2002 Citigroup was fined $215 million for Associates abusive lending practices.

n. Since then, Citigroup has shown a pattern of punishing those who came forward to report unethical or illegal activities while vigorously defending and rewarding those caught performing these acts.

| | |
|---|---|
| August 19, 2015 | **Citigroup Global Markets** will pay a $15 million penalty to settle SEC charges that it failed to enforce policies to prevent transactions that involved misuse of material, nonpublic information. Broker-dealer employees routinely have access to material nonpublic information. Therefore, federal securities laws require firms to take reasonable steps to prevent misuse of such information. An SEC investigation found that between 2002 and 2012, Citigroup's monitoring for such abuse was inadequate because it failed to review thousands of trades executed by its trading desks. Additionally, the SEC found that Citigroup inadvertently routed more than 467,000 transactions on behalf of advisory clients to an affiliated market maker which executed the transactions as principal at or near prevailing market prices. |
| August 17, 2015: | Administrative proceeding by the Securities and Exchange Commission (SEC) against Citigroup Alternative Investments LLC (CAI) and Citigroup Global Markets Inc. (CGMI). Citigroup agrees to |

pay $180 million for raising $2.898 billion by misleading almost 4,000 investors.

July 21, 2015:      U.S. Consumer Financial Protection Bureau orders Citigroup consumer bank to pay $770 million ($700 million refunded to consumers and $70 million penalty) because of the bank's illegal credit card practices. Citigroup misled customers about its credit cards, leading them into buying extra products that they didn't need or didn't understand.

June 18, 2015       The SEC announced enforcement actions against 36 municipal underwriting firms for violations in municipal bond offerings.  The cases are the first brought against underwriters under the Municipalities Continuing Disclosure Cooperation (MCDC) initiative, a voluntary self-reporting program targeting material misstatements and omissions in municipal bond offering documents.  The SEC's actions allege that between 2010 and 2014, the 36 firms violated federal securities laws by selling municipal bonds using offering documents that contained materially false statements or omissions about the bond issuers' compliance with continuing disclosure obligations. Under the terms of the MCDC initiative, each firm will pay civil penalties based on the number and size of fraudulent offerings identified, up to $500,000.  **Citigroup Global Markets Inc.** fined $500,000.

July 14, 2014       Citigroup agreed to pay $7 billion to resolve a U.S. government investigation into shoddy mortgage-backed securities the bank sold leading to the 2008 financial crisis. It should be noted Citigroup was responsible for the repeal of the Glass-Steagall act of 1933 preventing commercial banks and securities firms. Citigroup was also the lead into sub-prime lending among the large banks when it acquired Associates First Capital Corp, a subprime lender, in 2000.

May 20, 2015        Citigroup, involved from December 2007 until at least January 2013, plead guilty to rigging trades of the globe's most widely used currencies: the U.S. dollar and the euro and will pay $925 million to the justice department and $342 million to the Federal Reserve. Citigroup was put on probation for three years and required a waiver from the SEC to remain in this business.

November 2014       Citigroup fined $310 million by the U.S Commodity Futures Trading Commission and $358 million by Britain's Financial Conduct Authority as part of a settlement of charges that it and other major

banks manipulated the foreign exchange market. Total $1.02 billion paid to settle civil allegations with regulators

November 24, 2014 · FINRA fined Citigroup Global Markets $15 million for failing to adequately supervise communications between its stock analysts and the banks clients. A few weeks later, FINRA fined the company another $5 million as part of a case against ten investment banks for allowing their analysts to solicit business and offer favorable research coverage in connection with a planned initial public offering of Toys R Us in 2010. This is a repeat occurrence, with FINRA stating "Even when Citigroup discovered problems with its analysts' communications with clients, its disciplinary actions lacked the severity necessary to deter repeat violations". Citigroup was also fined $30 million in 2013 for allowing one of its analysts to share unpublished research about Apple with the hedge funds SAC Capital Advisors and Citadel and the giant fund manager T. Rowe Price, and $2 million in 2012 after an analyst shared nonpublic information about Facebook with TechCrunch, a site covering news about the technology world.

July 25, 2014 Citigroup business unit LavaFlow, Inc., which operates an alternative trading system (ATS), agreed to pay $5M to settle charges of failing to protect the confidential trading data of its subscribers. The payment includes a $2.85M penalty which is the SEC's largest to date against an ATS.

April 7, 2014 Citigroup agreed to pay $1.13 billion to settle claims by investors seeking the lender buy back billions in residential mortgage-backed securities. Citigroup deceived investors about the quality of the bonds being sold.

March 2014 Citigroup's Mexican affiliate Banamex being investigated by U.S. prosecutors in connection with possible money laundering charges.

December 2013 Citigroup fined $95 million by the European Commission for its role in the illegal manipulation of the LIBOR interest rate index by major U.S. and European banks. Citigroup admits to participating in the Yen Libor financial derivatives cartel to the European Commission

October 2013 Citigroup to pay $395 million to Freddie Mac to repurchase home loans the bank had sold to the mortgage agency that did not conform to the latter's guidelines

September 25, 2013     Citigroup to pay Freddie Mac $395 million to settle similar claims over roughly 3.7 million mortgages sold from 2000 to 2012

July 2013     Citigroup to pay $968 million to Fannie Mae to settle claims that it misrepresented the quality of home loans sold to the agency.

March 2013     Citigroup to pay $730 million to settle a lawsuit brought by institutional investors charging that they were misled by the bank concerning risks associated with several offerings of Citigroup preferred stock and bonds between 2006 and 2008.

Federal Reserve brought an enforcement action against Citigroup for having inadequate money-laundering controls.

2012     Citigroup one of five large mortgage servicers that consented to a $25 billion settlement with the federal government and state attorneys general to resolve allegations of loan servicing and foreclosure abuses. Citigroup agrees to pay $2.2 billion as its portion of the nationwide settlement of bank foreclosure fraud.

Citigroup to pay $158 million to settle charges that its mortgage unit fraudulently misled the federal government into insuring thousands of risky home loans.

Citigroup to pay $590 million to settle lawsuits charging that it deceived investors by concealing the extent of its exposure to toxic subprime debt.

FINRA fines: $600,000 for charging excessive markups and markdowns on bond transactions;

$2 million for supervisory violations relating to exchange-traded funds;

$3.5 million for providing inaccurate performance data related to subprime securitizations;

$888,000 for using municipal bond proceeds to pay for lobbyists.

The CFTC announced Citigroup would pay $525,000 to settle charges that it had exceeded limits on speculative positions in wheat futures.

2011     SEC agrees to settle with Citigroup for $285 million over claims it misled investors in a $1 billion financial product.  Citigroup had

selected approximately half the assets and was betting they would decline in value.

2010               SEC settles with Citigroup for $75 million over its misleading statements to investors that it had reduced its exposure to subprime mortgages to $13 billion when in fact the exposure was over $50 billion.

2009               Citigroup agrees to settle lawsuit brought by WorldCom investors for $2.65 billion.

2008               SEC forces Citigroup and UBS to buy back $30 billion in auction rate securities that were improperly sold to investors through misleading information.

### Requested Relief

Plaintiff respectfully requests the court grant the following relief:

56. Please provide "all relief necessary to make the employee whole," including preliminary reinstatement, back pay with interest, and compensation for any special damages sustained as a result of the retaliation, including litigation costs, expert witness fees, and reasonable attorney fees"..."within 60 days of the filing of [this] complaint"

57. Grant permanent injunctive relief directing Defendants to reinstate Plaintiff in his prior position.

58. Require defendants to pay damages sustained by Plaintiff by reason of the acts and transactions alleged herein.

59. Back pay, with interest.

60. Emotional distress damages

61. Punitive damages

62. Compensation for special damages, including litigation costs, expert witness fees and reasonable attorney fees.

63. Treble damages under RICO.

64. Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

65. Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

66. Grant Plaintiff a whistleblower's share of; 15 U.S. Code § 78u–6 - Securities whistleblower incentives and protection, and any settlement/action/fine from any other statutes culminating from publicly disseminated information within this filing.

67. Grant such other and further relief as this Court may determine to be just and necessary in the pursuit of substantive justice.

10/27/15

Abdul Jaludi
106 Maple cT
Milford  PA 18337

845- 699-7873