# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

ABDUL A. JALUDI,

    Plaintiff,

v.

CITIGROUP, et al.

    Defendant.

No. 3:15-cv-02076-MEM-JFS
(Judge Joseph F. Saporito, Jr.
United States Magistrate Judge)

**Plaintiff's reply to Defendants motion to dismiss**

Citigroup should forfeit this case or at the very least be sanctioned for misleading the court and dismiss this motion as untimely.

This motion should have been submitted over four years ago as part of the original and fraudulent motion to compel arbitration or to dismiss and is another effort to further delay the case.

Citigroup and the firm representing it in this lawsuit conspired to mislead this court and the court of appeals, and actually succeeded in misleading this court in the motion to compel arbitration and subsequent arguments in support of that motion, when they failed to disclose that a 2013 arbitration agreement was the current and latest agreement in effect at the time of Jaludi's dismissal.

Citigroup's Employee Relations advisor, Maureen J. O'Brien, declaration in support of Defendant's motion to compel arbitration and dismiss or stay plaintiff's

complaint, submitted by defendant as exhibits 3 and 4, also failed to include the 2013 handbook and arbitration agreement and only stated that a 2011 and a 2009 agreement were acknowledged and signed. In LUTZEIER v. CITIGROUP INC. Case No. 4:14CV183 RLW., Lutzeier was also dismissed in April of 2013. In that case Citigroup presented the 2013 agreement stating that Lutzeiers continued employment constituted his acceptance of the 2013 agreement which had been distributed to all employees in early December of 2012 and had to be accepted and acknowledged by the end of December in order for employment to continue.

In Defendants motion to compel arbitration they state the following:

> *However, an employee's continued employment after receipt of an arbitration policy is "sufficient to constitute both acceptance of the Company's offer [of continued employment] as well as consideration for an enforceable arbitration agreement."*

yet fail to disclose the 2013 employee handbook and arbitration agreement issued in early December 2012 and that Jaludi's continued employment consisted an enforceable arbitration agreement.

Neither can claim ignorance of this agreement since it was brought up in Jaludi's informal reply to the Defendant's response to the appeal brief (exhibit 1), submitted prior to the appointment of counsel and a new appeal schedule, which

2

Jaludi submitted to the court and to the lawyers representing Citigroup. The 2013 agreement was also mentioned by Plaintiffs counsel's brief to the appeals court, also sent to the defendant's attorneys.

No one came forward at any point in time to deny the 2013 agreement was in effect or to state that an oversight was made or declare that an error was made, even when an Appeals court judge stated during oral arguments that the 2013 agreement contained language which would have rendered the Defendants arbitration argument invalid.

First point:

Congress modified RICO to permit Retaliation as a predicate act, thereby removing any of the administrative requirements. Section 1107 of SOX, 18 U.S.C. § 1513(e), criminalizes whistleblower retaliation.

In 492 U.S. 229 (1989) H. J. INC. ET AL. v. NORTHWESTERN BELL TELEPHONE CO. ET AL. No. 87-1252 Supreme Court of United States.

The Supreme Court ruled Appeal courts erred affirming the district court's dismissal of petitioners' complaint for failure to plead a "pattern of racketeering activity." The Supreme Court reversed the judgment and remanded for further proceedings. The Supreme Court found the allegations and their alleged continuity

3

over a six year period, which may be established at trial, were sufficient to satisfy the requirements of relationship and continuity:

> *Petitioners' complaint alleges that at different times over the course of at least a 6-year period the noncommissioner respondents gave five members of the MPUC numerous bribes, in several different forms, with the objective — in which they were allegedly successful — of causing these commissioners to approve unfair and unreasonable rates for Northwestern Bell. RICO defines bribery as a "racketeering activity," 18 U. S. C. § 1961(1), so petitioners have alleged multiple predicate acts.*
>
> *Under the analysis we have set forth above, and consistent with the allegations in their complaint, petitioners may be able to prove that the multiple predicates alleged constitute "a pattern of racketeering activity," in that they satisfy the requirements of relationship and continuity. The acts of bribery alleged are said to be related by a common purpose, to influence commissioners in carrying out their duties in order to win approval of unfairly and unreasonably high rates for Northwestern Bell. Furthermore, petitioners claim that the racketeering predicates occurred with some frequency over at least a 6-year period, which may be sufficient to satisfy the continuity requirement. Alternatively, a threat of continuity of racketeering*

> *activity might be established at trial by showing that the alleged bribes were a regular way of conducting Northwestern Bell's ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise, the MPUC.*
>
> *The Court of Appeals thus erred in affirming the District Court's dismissal of petitioners' complaint for failure to plead "a pattern of racketeering activity." The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.*

In *DeGuelle v. Camilli,* 664 F.3d 192 (7th Cir. 2011) the Appeals court ruled the District Court erred when it dismissed the RICO claims by holding that the tax fraud and retaliation are unrelated offenses and thus do not form a pattern of racketeering activity. The Court of Appeals reversed, holding that "[r]etaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower. The Appeals court found:

> *This is troubling when one considers the purposes of the Sarbanes-Oxley Act and its addition of § 1513(e) to RICO's statutory scheme. When an employer retaliates against an employee, there is always an underlying motivation. In this case, for example, the motivation was to retaliate against*

5

*DeGuelle for disclosing the tax scheme. Retaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower.*

An inference from temporal proximity means that a whistleblower will not have to show that any particular official participated in both the crime and the retaliation. It also means that a whistleblower will not have to prove that any particular deciding official had knowledge of the protected activity. These facts can be inferred from the organization's knowledge. If a jury can infer retaliation, then it can also infer knowledge of the protected activity by the decision maker. See also, Jones v. Bernanke, 557 F.3d 670, 679 (D.C. Cir. 2009); Raphael v. Okyiri, 740 A.2d 935, 955 (DC 1999) ("common knowledge" on a "grapevine can often travel directly to the boss.")

The Appeals Court concluded that it can be inferred that the retaliatory acts "*were part of the original conspirators' agreement to conceal their fraud.*" Although DeGuelle's allegations were "sparse," they "*will be explored in greater detail throughout the discovery process.*"

Citigroup is hoping to avoid discovery and a trial simply by pleading innocence. Plaintiff should be given the opportunity during discovery and at trial to prove his claims, rather than having the case dismissed simply because Citigroup is denying his claims through simple pleadings. The Supreme Court has already ruled

6

that allegations over a period of time are enough to warrant discovery and a trial. Citigroup does not retaliate privately against employees who speak out but does so out in the open in order for all employees to understand what happens to anyone who speaks out.

Jaludi was the foremost expert at Citigroup in the area of command center monitoring, automation and management. Jaludi founded and worked with developers to build an web based application called WAIS to close security audit violations and automate emergency access to production, even though this was outside of his scope of work. WAIS is still currently is use at Citigroup, processing over 30,000 transactions per month and saving the bank millions of dollars a year while helping ensure a safe and secure environment. After the retaliation began, ownership and support for WAIS was taken away from Jaludi and all requests for his help were denied.

Jaludi authored an authoritative book on Command Centers, The Command Center Handbook, which received excellent reviews and was even used by Amazon to improve its command center monitoring and incident management processes.

The retaliation began in 2010 and continued through 2017 and still continues. After his dismissal, two employees who previously reported to Jaludi

were told that any interaction with Jaludi would be detrimental to their career. During discovery and at trial Jaludi intends to show that same message was given to anyone who interacted with and attempted to help Jaludi find employment. Throughout this timeframe Jaludi sent emails to Senator Pat Toomey (member of the congressional banking oversight committee), regulators managing the TARP stress tests, the Attorney Generals office, the SEC, the OCC and various other regulators and agencies.

In 2017, long after the initial notification, the Office of the Comptroller of the Currency (OCC) began discussions with Jaludi, including a conference call with representatives from various departments regarding his alleged illegal activities within the Operations and Technology division and their effect on customers (potentially billions of dollars due to unwarranted interest rate increases on alleged late payments from credit card customers. Many of these payments were mailed on time but delayed for various 'system problems' within the technology divisions which were never communicated to the various businesses).

On June 29th, 2018 Citigroup, which has a history of denying all allegations, set a precedent by freely admitting that it had overcharged 1.75 million credit card customers about $335 million dollars by failing to reduce penalty interest rates as required by law. What the bank failed to acknowledge was the interest rate should

8

not have been increased at all for many of these customers and that much more than $335 million was collected from customers whose interest rate was increased because the Operations and Technology division delayed the processing of their timely payment. For 2017 alone Citigroup Cards generated $19.317 billion in revenue.

Before Citigroup began requiring employees to enter their ID number on the Voice of the Employee "anonymous" survey, retaliation was listed by a majority of employees as one of the biggest complaints.

Jaludi's claim is the retaliation never stopped and may have actually been reinforced after the bank was forced to refund the $335 million. The December 20th incident mentioned below and reported to OSHA is a prime example that the retaliation was ongoing

On December 20, 2017 Jaludi was contacted by Steve Harris, an executive recruiter who was aware of Jaludi's expertise managing Command Centers, regarding a Command Center manager position in New York City with JP Morgan Chase, which they were having difficulty filling. Jaludi sent Mr. Harris a copy of his resume to be revised then submitted to Chase sometime in January. On January 30 Jaludi asked Mr. Harris if there was a response and Mr. Harris responded 4 minutes later saying nothing yet. On Feb 20th Jaludi asked again if there was a

9

response and received no answer. Jaludi tried contacting Mr. Harris numerous times, calling, emailing and leaving voicemails asking for an update and a copy of his revised resume. Mr. Harris stopped responding, until five months later. On May 24, 9 days after Citigroup responded to the OSHA complaint, Mr. Harris sent Jaludi a copy of the revised resume.

At least 4 former Citigroup Operations and Technology executives, including James Keck who was one of the individuals responsible for deleting trouble tickets, were working at Chase at the time these events transpired.

Citigroup has blacklisted Jaludi from gaining employment in the IT field, either within Citigroup or elsewhere, where he is a recognized expert in violation of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act, 18 U.S.C. 1514a (SOX) and intends to prove this during discovery and trial. If the court deems the 2017 incident necessary then I would ask for permission to amend the complaint to add this example of ongoing retaliation.

Dated: October 29, 2019                                             Respectfully submitted,

/s/ Abdul A. Jaludi
Abdul A. Jaludi
106 Maple Ct
Milford, PA 18337
Tel: 845-699-7873
*Plaintiff*